# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Case No. 17CV2024 LAB KSC

**FEDERAL TRADE COMMISSION**,
                                    Plaintiff,

            v.

**TARR INC.**, et al.

                        Defendants.

**STIPULATED ORDER FOR PERMANENT INJUNCTION AND MONETARY JUDGMENT AGAINST ALL DEFENDANTS**

Plaintiff, the Federal Trade Commission ("Commission" or "FTC"), filed its Complaint for Permanent Injunction and Other Equitable Relief ("Complaint") for a permanent injunction and other equitable relief in this matter, pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), Section 5 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8404, and Section 918(c) of the Electronic Fund Transfer Act ("EFTA"), 15

1

U.S.C. § 1693o(c). The Commission and Defendants Tarr Inc., Ad Kings LLC, Apex Advertising LLC, Brand Development Corp., Coastal Ads LLC, Delux Advertising LLC, Diamond Ads LLC, Digital Nutra LLC, Exclusive Advertising LLC, Iron Ads, LLC, LeadKing Advertising LLC, Lead Seeker LLC, Mints Marketing LLC, Onyx Ads, LLC, Product Center, LLC, Rebem, LLC, Supertiser LLC, Verticality Advertising, LLC, White Dog Marketing, LLC, Richard Fowler, Ryan Fowler, and Nathan Martinez stipulate to the entry of this Stipulated Order for Permanent Injunction and Monetary Judgment Against All Defendants ("Order") to resolve all matters in dispute in this action among them.

THEREFORE, IT IS ORDERED as follows:

## FINDINGS

1.     This Court has jurisdiction over this matter.

2.     The Complaint charges that Defendants participated in deceptive and unfair acts or practices in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45 and 52; Section 4 of ROSCA, 15 U.S.C. § 8403; Section 907(a) of EFTA, 15 U.S.C. § 1693e(a); and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b), in connection with the deceptive labeling, advertising, marketing, promotion, offering for sale, or sale of Dietary Supplements, skin creams, Add-On products, and other products, services, and programs.

3.     Defendants neither admit nor deny any of the allegations in the Complaint, except as specifically stated in this Order. Only for purposes of this action, Defendants admit the facts necessary to establish jurisdiction.

4.     Defendants waive any claim that they may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agree to bear their own costs and attorney fees.

5.     Defendants and the Commission waive all rights to appeal or otherwise challenge or contest the validity of this Order.

2

# **DEFINITIONS**

For the purpose of this Order, the following definitions apply:

A. "**Add-On**" means any additional product, service, or program that is offered to the consumer for purchase immediately preceding, at the time of, or closely proximate in time after the consumer's purchase of a different product, service, or program, where the different product, service, or program is or was advertised, marketed, promoted, or offered for sale by Defendants, whether directly or through an intermediary, including by consulting, planning, participating, facilitating, or advising.

B. "**Affiliate**" means any person, including any third-party marketer, who participates in an Affiliate Program.

C. "**Affiliate Network**" means any person who provides another person with Affiliates for an Affiliate Program or with whom any person contracts as an Affiliate to promote any product, service, or program.

D. "**Affiliate Program**" means any arrangement under which any Defendant pays, or offers to pay, or provides, or offers to provide, any form of consideration to any third party, either directly or through an Affiliate Network (i) to provide any Defendant with, or refer to any Defendant, potential or actual customers; or (ii) otherwise to market, advertise, or offer for sale any product, service, or program on behalf of any Defendant.

E. "**Billing Information**" means any data that enables any person to access a customer's account, such as a credit card, checking, savings, share, or similar account, utility bill, mortgage loan account, or debit card.

F. "**Charge,**" "**charged**," or "**charging**" means any attempt to collect money or other consideration from a consumer, including causing Billing Information to be submitted for payment, including against the consumer's credit card, debit card, bank account, telephone bill, or other account.

3

G.      "**Clear and Conspicuous**" or "**Clearly and Conspicuously**" means that a required disclosure is difficult to miss (i.e., easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways:

1.      In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented.  In any communication made through both visual and audible means, such as a television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means;

2.      A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood;

3.      An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it;

4.      In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable;

5.      On a product label, the disclosure must be presented on the principal display panel;

6.      The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears;

7.      The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications;

8.      The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication; and

9.      When the representation or sales practice targets a specific audience, such as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable members of that group.

H.      "**Close Proximity**" means immediately adjacent to the triggering representation.  In the case of advertisements disseminated verbally or through audible means, the disclosure shall be made as soon as practicable after the triggering representation.

I.      "**Corporate Defendants**" means Tarr Inc., Ad Kings LLC, Apex Advertising LLC, Brand Development Corp., Coastal Ads LLC, Delux Advertising LLC, Diamond Ads LLC, Digital Nutra LLC, Exclusive Advertising LLC, Iron Ads, LLC, LeadKing Advertising LLC, Lead Seeker, LLC, Mints Marketing LLC, Onyx Ads, LLC, Product Center, LLC, Rebem, LLC, Supertiser LLC, Verticality Advertising, LLC, and White Dog Marketing, LLC, and their successors and assigns.

J.      "**Cosmetic**" means:

1.      articles to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to the human body or any part thereof intended for cleansing, beautifying, promoting attractiveness, or altering the appearance; and

2.      articles intended for use as a component of any such article, except that such term shall not include soap.

K.      "**Covered Product**" means any Dietary Supplement, Food, or Drug, including Alpha Rush Pro, Beauty Labs, Bella Labs Instant Wrinkle Reducer, Biofinite, Brain Storm Elite, Cellublast, Crème del Mar, Dermarose Eye Serum, Dermarose Face Cream, Elite Test 360, Fat Burn X, Fat Shred X, Flawless Raspberry Ketone, Forskolin Belly Buster, Garcinia Cambogia Slim Fast, Green Coffee Fat Burn, Jacked Muscle X, La Crème Anti-Wrinkle Cream, Miracle

5

Garcinia Cambogia, Miracle Green Coffee, Miracle Muscle, Miracle Phytoceramides, Miracle Saffron, Perfect Age Skin Care, Ripped Muscle X, Superior Muscle X, Superior Test X, The Memory Plus, Try Miracle Cleanse, and Ultimate Muscle Black Edition.

L.     "**Defendants**" means all of the Individual Defendants and the Corporate Defendants, individually, collectively, or in any combination.

M.     "**Dietary Supplement**" means:

1.     any product labeled as a dietary supplement or otherwise represented as a dietary supplement; or

2.     any pill, tablet, capsule, powder, softgel, gelcap, liquid, or other similar form containing one or more ingredients that are a vitamin, mineral, herb or other botanical, amino acid, probiotic, or other dietary substance for use by humans to supplement the diet by increasing the total dietary intake, or a concentrate, metabolite, constituent, extract, or combination of any ingredient described above, that is intended to be ingested, and is not represented to be used as a conventional Food or as a sole item of a meal or the diet.

N.     "**Drug**" means:

1.     articles recognized in the official United States Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them;

2.     articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in humans or other animals;

3.     articles (other than Food) intended to affect the structure or any function of the body of humans or other animals; and

4.     articles intended for use as a component of any article specified in Subsection (1), (2), or (3); but does not include devices or their components, parts, or accessories.

O.    "**Essentially Equivalent Product**" means a product that contains the identical ingredients, except for inactive ingredients (*e.g.*, binders, colors, fillers, excipients), in the same form and dosage, and with the same route of administration (*e.g.*, orally, sublingually), as the Covered Product; *provided that* the Covered Product may contain additional ingredients if reliable scientific evidence generally accepted by experts in the field indicates that the amount and combination of additional ingredients is unlikely to impede or inhibit the effectiveness of the ingredients in the Essentially Equivalent Product.

P.    "**Food**" means:

1.    any article used for food or drink for humans or other animals;

2.    chewing gum; and

3.    any article used for components of any such article.

Q.    "**Including**" means including but not limited to.

R.    "**Individual Defendants**" means Richard Fowler, Ryan Fowler, and Nathan Martinez.

S.    "**Negative Option Feature**" means, in an offer or agreement to sell or provide any product, service, or program, a provision under which the consumer's silence or failure to take affirmative action to reject a product, service, or program, or to cancel the agreement, is interpreted by the seller or provider as acceptance or continuing acceptance of the offer.

T.    "**Plaintiff**," "**Commission**," or "**FTC**" means the Federal Trade Commission.

U.    "**Related Companies**" means American Homerise LLC, Ball Enterprises LLC, Black Series, LLC, Corsa LLC, Creative Ads Inc., Electra Media LLC, FFM LLC, Force of Nature LLC, Gimme Enterprises LLC, Inferno LLC, Luxlense LLC, Martinex Motors, LLC, MK55 Tactical LLC, New Paradigm Inc., and Shadowhawk Tactical, LLC, and their successors and assigns.

V.     "**Reliably Reported**," for a human clinical test or study ("test"), means a report of the test has been published in a peer-reviewed journal, and such published report provides sufficient information about the test for experts in the relevant field to assess the reliability of the results.

W.     "**Telemarketing**" means any plan, program, or campaign which is conducted to induce the purchase of any product, service, plan, or program by use of one or more telephones, and which involves a telephone call, whether or not covered by the Telemarketing Sales Rule, 16 C.F.R. Part 310.

## ORDER

## I.

## BAN ON CERTAIN NEGATIVE OPTION SALES

**IT IS ORDERED** that Defendants are permanently restrained and enjoined from advertising, marketing, promoting, or offering for sale, whether directly or through an intermediary, including by consulting, planning, participating, facilitating, or advising, any product, service, or program with a Negative Option Feature in the following circumstances:

A.     Where the product, service, or program is or relates to a Cosmetic, Food, Dietary Supplement, or Drug, or is for a diet or weight-loss service or program;

B.     Where the product, service, or program is or relates to an Add-On product, service, or program; or

C.     Where the product, service, or program is advertised, marketed, promoted, or offered for sale as either "free," a "trial," a "sample," a "bonus," a "gift," "no obligation," or using any other words, depictions, or illustrations that denote or imply the absence of an obligation on the part of the recipient of the offer to affirmatively act in order to avoid Charges.

**PROHIBITED BUSINESS ACTIVITIES**

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promotion, offering for sale, or sale of any product, service, or program are permanently restrained and enjoined from:

A.     Before a consumer consents to pay for such product, service, or program, failing to disclose, or assisting others in failing to disclose in a Clear and Conspicuous manner, expressly or by implication, all material terms and conditions of any offer, including:

1.     the total cost or price of the product, service, or program, as well as the price per unit;

2.     the amount, timing, and manner of all fees, Charges, or other amounts that a consumer will be charged or billed, including the date of the Charge and whether it will be a credit card or checking account Charge; and

3.     the mechanism for consumers to stop a Charge.

B.     Before a consumer consents to pay for such product, service, or program, failing to disclose, or assisting others in failing to disclose in a Clear and Conspicuous manner, expressly or by implication, all material terms and conditions of any refund or cancellation policy, including:

1.     the specific steps and means by which such requests must be submitted;

2.     the customer service telephone number or numbers that a customer must call to cancel and/or return products, services, or programs;

3. the email address, web address, or street address to which such requests must be directed;

4. any mechanism that customers must use to return any products, including any requirement for specific tracking methods or delivery confirmation for a package;

5. a statement regarding any policy of not making refunds or cancellations, including any requirement that a product will not be accepted for return or refund unless it is unopened and in re-sellable condition; and

6. the duration of Defendants' refund and cancellation policy, including the date that it begins to run.

C. Misrepresenting, or assisting others in misrepresenting, expressly or by implication, any fact material to consumers concerning any product, service, or program, such as:

1. that the consumer will not be Charged for any product, service, or program;

2. that a product, service, or program is free, risk free, a bonus, a gift, without cost, or without obligation;

3. that the consumer can obtain a product, service, or program for a processing, service, shipping, handling, or administrative fee with no further obligation;

4. the purpose(s) for which the consumer's Billing Information will be used;

5. the date by which the consumer will incur any obligation or be Charged unless the consumer takes an affirmative action with respect to a Negative Option Feature that is not banned under the Section of this Order entitled "Ban on Certain Negative Option Sales";

6.     that a purchase is offered with a satisfaction guarantee or with a money-back guarantee;

7.     that Defendants will provide full refunds to all consumers who request them;

8.     that any advertisement for a product, service, or program sold by Defendants is an objective source of information, such as an unaffiliated news report or magazine article;

9.     that an endorsement is by a bona fide user of the product, service, or program and reflects the honest opinions, findings, beliefs, or experience of the endorser;

10.     that any consumer testimonial reflects typical consumer experiences with the product, service, or program;

11.     that independent tests demonstrate the effectiveness of any product, service, or program, including any Covered Product;

12.     the total cost to purchase, receive, or use any product, service, or program;

13.     any material restrictions, limitations or conditions to purchase, receive, or use the product, service, or program;

14.     that a transaction has been authorized by a consumer;

15.     any material aspect of the performance, efficacy, nature, or central characteristics of the product, service, or program; and

16.     any material aspect of the nature or terms of a refund, cancellation, exchange, or repurchase policy for the product, service, or program.

D.     Failing, in connection with the advertising, promotion, marketing, offering for sale, sale, or provision of any product, service, or program through an Affiliate Program to:

1.     Require each Affiliate and/or Affiliate Network to provide to Defendants the following identifying information:

    a.     In the case of a natural person, the Affiliate's or Affiliate Network's first and last name, physical address, country, telephone number, email address, and complete bank account information as to where payments are to be made to that person;

    b.     In the case of a business entity, the Affiliate's or Affiliate Network's name and any and all names under which it does business, state of incorporation, registered agent, and the first and last name, physical address, country, telephone number, and email address for at least one natural person who owns, manages, or controls the Affiliate or Affiliate Network, and the complete bank account information as to where payments are to be made to the Affiliate or Affiliate Network;

    c.     If Defendants only have access to certain Affiliates through an Affiliate Network, then Defendants shall contractually require each Affiliate Network to obtain and maintain from those Affiliates the identifying information set forth in Subsections D.1.a and D.1.b of this Section prior to the Affiliate's or Affiliate Network's participation in the Defendants' Affiliate Program.

2.     As a condition of doing business with any Affiliate or Affiliate Network or such Affiliate or Affiliate Network's acceptance into Defendants' Affiliate Program: (a) provide each such Affiliate or Affiliate Network a copy of this Order; (b) obtain from each such Affiliate or Affiliate Network a signed and dated statement acknowledging receipt of this Order and expressly agreeing to comply with this Order; and (c) clearly and conspicuously disclose in writing that engaging in acts or practices prohibited by this Order will result in immediate termination of any Affiliate or Affiliate Network and forfeiture of all monies owed

to such Affiliate or Affiliate Network; *provided, however*, that if Defendants only have access to certain Affiliates through an Affiliate Network, then Defendants shall contractually require that the Affiliate Network provide the information required by this Subsection to each of those Affiliates and retain proof of the same prior to any such Affiliate being used in Defendants' Affiliate Program; and if Defendants should acquire any entity that has an existing program of selling through Affiliates, the entity must complete all steps in this Subsection prior to Defendants' acquisition of the entity.

    3.  Require that each Affiliate or Affiliate Network, prior to the public use or dissemination of any marketing materials, including websites, emails, and pop-ups used by any Affiliate or Affiliate Network to advertise, promote, market, offer for sale, or sell any products, services, or programs through Defendants' Affiliate Program, provide Defendants with the following information: (a) copies of all materially different marketing materials to be used by the Affiliate or Affiliate Network, including text, graphics, video, audio, and photographs; (b) each location the Affiliate or Affiliate Network maintains, or directly or indirectly controls, where the marketing materials will appear, including the URL of any website; (c) for hyperlinks contained within the marketing materials, each location to which a consumer will be transferred by clicking on the hyperlink, including the URL of any website; and (d) the range of dates that the marketing materials will be publicly used or disseminated to consumers; *provided, however,* that if Defendants only have access to certain Affiliates through an Affiliate Network, then Defendants shall contractually require that the Affiliate Network obtain and maintain the same information set forth above from each of those Affiliates who are part of Defendants' Affiliate Program prior to the public use or dissemination of any such marketing materials, and provide proof to Defendants of having obtained the same.

4.      Promptly review the marketing materials specified in Section II.D.3 above as necessary to ensure compliance with this Order.  Defendants shall also promptly take steps as necessary to ensure that the marketing materials provided to Defendants under Section II.D.3 above are the marketing materials publicly used or disseminated to consumers by the Affiliate or Affiliate Network. If Defendants determine that the use of any marketing material does not comply with this Order, Defendants shall inform the Affiliate or Affiliate Network in writing that approval is denied and shall not pay any amounts to the Affiliate or Affiliate Network for such marketing, including any payments for leads, "click-throughs," or sales resulting therefrom; *provided, however*, that if Defendants only have access to certain Affiliates through an Affiliate Network, then Defendants shall contractually require that the Affiliate Network comply with the procedures set forth in this Subsection as to those Affiliates.

5.      Promptly and completely investigate any complaints that Defendants receive through any source to determine whether any Affiliate or Affiliate Network is engaging in acts or practices prohibited by this Order, either directly or through any Affiliate that is part of Defendants' Affiliate Program.

6.      Upon determining that any Affiliate or Affiliate Network has engaged in, or is engaging in, acts or practices prohibited by this Order, either directly or through any Affiliate that is part of Defendants' Affiliate Program, immediately:

a.      Disable any connection between the Defendants' Affiliate Program and the marketing materials used by the Affiliate or Affiliate Network to engage in such acts or practices prohibited by this Order;

b.      Immediately halt the processing of any payments or charges generated by the Affiliate or Affiliate Network;

14

c.     Fully refund, or cause to be refunded, within five (5) business days, each consumer charged by Defendants whose sale originated from the Affiliate or Affiliate Network on or after the date the Affiliate or Affiliate Network engaged in acts or practices prohibited by this Order; and

d.     Immediately terminate the Affiliate or Affiliate Network; *provided, however*, Defendants shall not be in violation of this subsection if Defendants fail to terminate an Affiliate Network in a case where Defendants' only access to an Affiliate who has engaged in acts or practices prohibited by this Order is through an Affiliate Network and Defendants receive notice that the Affiliate Network immediately terminated the Affiliate violating this Order from any Affiliate Program maintained by the Defendants.

## III.

## REQUIRED DISCLOSURES RELATING TO
## NEGATIVE OPTION FEATURES

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with promoting or offering for sale any product, service, or program with a Negative Option Feature, other than any product, service, or program covered under the Section of this Order entitled "Ban on Certain Negative Option Sales," are permanently restrained and enjoined from:

A.     Obtaining Billing Information from a consumer for any transaction involving a product, service, or program that includes a Negative Option Feature, without first disclosing Clearly and Conspicuously, and in Close Proximity to where a consumer provides Billing Information:

1.     The extent to which the consumer must take affirmative action(s) to avoid any Charges on a recurring basis;

15

2.     The total cost (or range of costs) the consumer will be Charged, the date the initial Charge will be submitted for payment, and the frequency of such Charges unless the consumer timely takes affirmative steps to prevent or stop such Charges;

3.     The deadline(s) (by date or frequency) by which the consumer must affirmatively act in order to stop all recurring Charges;

4.     The name of the seller or provider of the product, service or program and, if the name of the seller or provider will not appear on billing statements, the billing descriptor that will appear on such statements;

5.     A description of the product, service, or program;

6.     Any Charge or cost for which the consumer is responsible in connection with the cancellation of an order or the return of a product; and

7.     The simple cancellation mechanism to stop any recurring Charges, as required by Section V of this Order.

B.     Failing to send the consumer:

1.     Immediately after the consumer's submission of an online order, written confirmation of the transaction by email. The email must Clearly and Conspicuously disclose all the information required by Subsection III.A, and contain a subject line reading "Order Confirmation" along with the name of the product, service, or program and no additional information; or

2.     Within two (2) days after receipt of the consumer's order by mail or telephone, a written confirmation of the transaction, either by email or first class mail. The email or letter must Clearly and Conspicuously disclose all the information required by Subsection III.A. The subject line of the email must Clearly and Conspicuously state "Order Confirmation" along with the name of the product, service, or program and nothing else. The outside of the envelope must Clearly and Conspicuously state "Order Confirmation" along with the name of the

product, service, or program and no additional information other than the consumer's address, the seller's return address, and postage.

IV.

**OBTAINING EXPRESS INFORMED CONSENT**

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with promoting or offering for sale any product, service, or program with a Negative Option Feature, other than any product, service, or program covered under the Section of this Order entitled "Ban on Certain Negative Option Sales," are permanently restrained and enjoined from using, or assisting others in using, Billing Information to obtain payment from a consumer, unless Defendants first obtain the express informed consent of the consumer to do so. To obtain express informed consent, Defendants must:

A. For all written offers (including over the Internet or other web-based applications or services), obtain consent through a check box, signature, or other substantially similar method, which the consumer must affirmatively select or sign to accept the Negative Option Feature, and no other portion of the offer. Defendants shall disclose Clearly and Conspicuously, and in Close Proximity to such check box, signature, or substantially similar method of affirmative consent, only the following, with no additional information:

1. The extent to which the consumer must take affirmative action(s) to avoid any Charges on a recurring basis;

2. The total cost (or range of costs) the consumer will be Charged and, if applicable, the frequency of such Charges unless the consumer timely takes affirmative steps to prevent or stop such Charges; and

3. The deadline(s) (by date or frequency) by which the consumer must affirmatively act in order to stop all recurring Charges.

B. For all oral offers, prior to obtaining any Billing Information from the consumer:

1. Clearly and Conspicuously disclose the information contained in Subsection III.A; and

2. Obtain affirmative unambiguous express oral confirmation that the consumer: (a) consents to being Charged for any product, service, or program, including providing, at a minimum, the last four (4) digits of the consumer's account number to be Charged, (b) understands that the transaction includes a Negative Option Feature, and (c) understands the specific affirmative steps the consumer must take to prevent or stop further Charges.

C. For transactions conducted through Telemarketing, Defendants shall maintain for three (3) years from the date of each transaction an unedited voice recording of the entire transaction, including the prescribed statements set out in Subsection IV.B. Each recording must be retrievable by date and by the consumer's name, telephone number, or Billing Information, and must be provided upon request to the consumer, the consumer's bank, or any law enforcement entity.

## V.

## SIMPLE MECHANISM TO CANCEL
## NEGATIVE OPTION FEATURE

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with promoting or offering for sale any product, service, or program with a Negative Option Feature, other than any product, service, or program covered under the Section of this Order entitled "Ban

on Certain Negative Option Sales," are permanently restrained and enjoined from failing to provide a simple mechanism for the consumer to immediately stop any recurring Charges. Such mechanism must not be difficult, costly, confusing, or time consuming, and must be at least as simple as the mechanism the consumer used to initiate the Charge(s). In addition:

A. For consumers who entered into the agreement to purchase a product, service, or program including a Negative Option Feature over the Internet or through other web-based applications or services, Defendants must provide a mechanism, accessible over the Internet or through such other web-based application or service that consumers can easily use to cancel the product, service, or program and to immediately stop all further Charges.

B. For consumers who entered into the agreement to purchase a product, service, or program, including a Negative Option Feature through an oral offer and acceptance, Defendants must maintain a telephone number and a postal address that consumers can easily use to cancel the product, service, or program and to immediately stop all further Charges. Defendants must assure that all calls to this telephone number shall be answered during normal business hours and that mail to the postal address is retrieved regularly.

## VI.

## BANNED WEIGHT-LOSS CLAIMS

**IT IS FURTHER ORDERED** that Defendants, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Dietary Supplement, over-the-counter Drug, patch, cream, wrap, or other product worn on the body or rubbed into the skin, are permanently restrained and enjoined from representing, or assisting others in representing, in any manner, expressly or by implication, including through the

19

use of a product name, endorsement, depiction, illustration, trademark, or trade name, that such product:

A.    Causes weight loss of two pounds or more a week for a month or more without dieting or exercise;

B.    Causes substantial weight loss no matter what or how much the consumer eats;

C.    Causes permanent weight loss even after the consumer stops using the product;

D.    Blocks the absorption of fat or calories to enable consumers to lose substantial weight;

E.    Safely enables consumers to lose more than three pounds per week for more than four weeks;

F.    Causes substantial weight loss for all users; or

G.    Causes substantial weight loss by wearing a product on the body or rubbing it into the skin.

## VII.

## PROHIBITED REPRESENTATIONS:

## WEIGHT-LOSS CLAIMS

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Covered Product, are permanently restrained and enjoined from making, or assisting others in making, expressly or by implication, including through the use of a product name, endorsement, depiction, or illustration, any representation, other than

representations covered under the Section of this Order entitled "Banned Weight-Loss Claims," that, in humans, such Covered Product:

A.     Causes, or assists in causing, weight loss or any specific amount of weight loss;

B.     Causes, or assists in causing, rapid or sustained weight loss;

C.     Causes, or assists in causing, loss of belly fat; or

D.     Cures, mitigates, or treats any disease;

unless the representation is non-misleading and, at the time of making such representation, they possess and rely upon competent and reliable scientific evidence substantiating that the representation is true. For purposes of this Section, competent and reliable scientific evidence shall consist of human clinical testing of the Covered Product, or of an Essentially Equivalent Product, that is sufficient in quality and quantity, based on standards generally accepted by experts in the relevant disease, condition, or function to which the representation relates, when considered in light of the entire body of relevant and reliable scientific evidence, to substantiate that the representation is true. Such testing must be: (1) randomized, double-blind, and placebo-controlled; and (2) conducted by researchers qualified by training and experience to conduct such testing. In addition, all underlying or supporting data and documents generally accepted by experts in the field as relevant to an assessment of such testing as described in the Section of this Order entitled "Preservation of Records Relating to Competent and Reliable Human Clinical Tests or Studies" must be available for inspection and production to the Commission. Persons covered by this Section shall have the burden of proving that a product satisfies the definition of Essentially Equivalent Product.

# VIII.

## PROHIBITED REPRESENTATIONS:
## OTHER STRUCTURE OR FUNCTION AND
## HEALTH-RELATED CLAIMS

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Covered Product, are permanently restrained and enjoined from making, or assisting others in making, expressly or by implication, including through the use of a product name, endorsement, depiction, or illustration, any representation, other than representations covered under the Sections of this Order entitled "Banned Weight-Loss Claims" and "Prohibited Representations: Weight-Loss Claims," about the health benefits, performance, efficacy, safety, or side effects of any Covered Product, including that the Covered Product (1) causes, or assists in causing, increased muscle growth or muscle mass, or (2) permanently, significantly, and/or dramatically eliminates or lessens sagging skin, wrinkles or age spots, unless the representation is non-misleading, and, at the time of making such representation, they possess and rely upon competent and reliable scientific evidence that is sufficient in quality and quantity based on standards generally accepted by experts in the relevant disease, condition, or function to which the representation relates, when considered in light of the entire body of relevant and reliable scientific evidence, to substantiate that the representation is true.

For purposes of this Section, competent and reliable scientific evidence means tests, analyses, research, or studies (1) that have been conducted and evaluated in an objective manner by experts in the relevant disease, condition, or

function to which the representation relates; (2) that are generally accepted by such experts to yield accurate and reliable results; and (3) that are randomized, double-blind, and placebo-controlled human clinical testing of the Covered Product, or of an Essentially Equivalent Product, when such experts would generally require such human clinical testing to substantiate that the representation is true.  In addition, when such tests or studies are human clinical tests or studies, all underlying or supporting data and documents generally accepted by experts in the field as relevant to an assessment of such testing as set forth in the Section of this Order entitled "Preservation of Records Relating to Competent and Reliable Human Clinical Tests or Studies" must be available for inspection and production to the Commission.  Persons covered by this Section have the burden of proving that a product satisfies the definition of Essentially Equivalent Product.

**IX.**

**PROHIBITED REPRESENTATIONS REGARDING TESTS OR STUDIES**

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Covered Product, are permanently restrained and enjoined from misrepresenting, or assisting others in misrepresenting, in any manner, expressly or by implication, including through the use of any product name, endorsement, depiction, or illustration:

A.    That any Covered Product is clinically proven to cause weight loss, muscle growth, or wrinkle reduction;

B.    The existence, contents, validity, results, conclusions, or interpretations of any test, study, or research; or

C.    That the performance or benefits of any product are scientifically or clinically proven or otherwise established.

## X.

### FDA APPROVED CLAIMS

**IT IS FURTHER ORDERED** that nothing in this Order prohibits Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, from:

A.    For any Drug, making a representation that is approved in labeling for such Drug under any tentative or final monograph promulgated by the Food and Drug Administration, or under any new drug application approved by the Food and Drug Administration; and

B.    For any product, making a representation that is specifically authorized for use in labeling for such product by regulations promulgated by the Food and Drug Administration pursuant to the Nutrition Labeling and Education Act of 1990 or permitted under Sections 303-304 of the Food and Drug Administration Modernization Act of 1997.

## XI.

### PRESERVATION OF RECORDS RELATING TO COMPETENT AND RELIABLE HUMAN CLINICAL TESTS OR STUDIES

**IT IS FURTHER ORDERED** that, with regard to any human clinical test or study ("test") upon which Defendants rely to substantiate any claim covered by this Order, Defendants shall secure and preserve all underlying or supporting data and documents generally accepted by experts in the field as relevant to an assessment of the test, including:

A.    All protocols and protocol amendments, reports, articles, write-ups, or other accounts of the results of the test, and drafts of such documents reviewed by the test sponsor or any other person not employed by the research entity;

B.     All documents referring or relating to recruitment; randomization; instructions, including oral instructions, to participants; and participant compliance;

C.     Documents sufficient to identify all test participants, including any participants who did not complete the test, and all communications with any participants relating to the test; all raw data collected from participants enrolled in the test, including any participants who did not complete the test; source documents for such data; any data dictionaries; and any case report forms;

D.     All documents referring or relating to any statistical analysis of any test data, including any pretest analysis, intent-to-treat analysis, or between-group analysis performed on any test data; and

E.     All documents referring or relating to the sponsorship of the test, including all communications and contracts between any sponsor and the test's researchers.

*Provided, however*, the preceding preservation requirement does not apply to a Reliably Reported test, unless the test was conducted, controlled, or sponsored, in whole or in part by:  (1) any Defendant; (2) any of Defendants' officers, agents, representatives, or employees; (3) any other person or entity in active concert or participation with any Defendant; (4) any person or entity affiliated with or acting on behalf of any Defendant; (5) any supplier of any ingredient contained in the product at issue to any of the foregoing or to the product's manufacturer; or (6) the supplier or manufacturer of such product.

For any test conducted, controlled, or sponsored, in whole or in part, by Defendants, Defendants must establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of any personal information collected from or about participants.  These procedures must be documented in writing and must contain administrative, technical, and physical safeguards

appropriate to Corporate Defendants' size and complexity, the nature and scope of Defendants' activities, and the sensitivity of the personal information collected from or about the participants.

## XII.

## PROHIBITIONS AGAINST VIOLATION OF THE ELECTRONIC FUND TRANSFER ACT

**IT IS FURTHER ORDERED** that Defendants and Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the sale of any product, service, or program are hereby permanently restrained and enjoined from:

A.     Engaging in any recurring debiting of a consumer's account without first obtaining a valid written pre-authorization for preauthorized electronic fund transfers from the consumer's account, which pre-authorization is clear and readily understandable, identifiable as a pre-authorization, and reflects the consumer's assent, as required by Section 907(a) of the Electronic Fund Transfer Act, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, as more fully set out in Section 1005.10(b) of the Consumer Financial Protection Bureau's Official Staff Commentary to Regulation E ("Official Staff Commentary to Regulation E"), 12 C.F.R. § 1005.10(b), cmts. 5 and 6, Supp. I;

B.     Engaging in any recurring debiting of a consumer's account without first providing a copy of a valid written pre-authorization to the consumer for preauthorized electronic fund transfers from the consumer's account, which copy is clear and readily understandable, identifiable as a pre-authorization, and reflects the consumer's assent, as required by Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, as more fully set out in

Section 1005.10(b) of the Official Staff Commentary to Regulation E, 12 C.F.R. § 1005.10(b), cmts. 5 and 6, Supp. I; and

C.     Failing to maintain procedures reasonably adapted to avoid an unintentional failure to obtain a written authorization for preauthorized electronic fund transfers, as required in Section 1005.10(b) of the Official Staff Commentary to Regulation E, 12 C.F.R. § 1005.10(b), cmt. 7, Supp. I.

## XIII.

## MONETARY JUDGMENT AND PARTIAL SUSPENSION

**IT IS FURTHER ORDERED** that:

A.     Judgment in the amount of one hundred seventy-nine million dollars ($179,000,000) is entered in favor of the Commission against Defendants, jointly and severally, as equitable monetary relief.  Upon complete payment and transfer to the Commission of all assets listed in Subsections XIII.B-D below, the remainder of the judgment is suspended, subject to Subsections XIII.F-H below.

B.     In partial satisfaction of the monetary judgment set forth above, Defendants hereby relinquish and assign to the Commission all legal and equitable right, title, control, or interest in the assets listed below effective upon entry of this Order, and the following transfers of assets shall occur within seven (7) days of entry of this order by electronic fund transfer in accordance with instructions provided by a representative of the Commission:

1.     The Defendants shall transfer to the Commission four million, seventy-two thousand, three hundred fifty-five dollars ($4,072,355), which, as the Defendants stipulate, their counsel holds in escrow for no purpose other than payment to the Commission.

C.     In partial satisfaction of the monetary judgment set forth above, Defendants hereby relinquish and assign to the Commission all legal and equitable right, title, control, or interest, in the following assets listed below (in the amount

27

of at least two million, three hundred eight thousand, eight hundred ninety dollars ($2,308,890)) effective upon entry of this Order, and the following transfers of assets shall occur within seven (7) days of entry of this order by electronic fund transfer in accordance with instructions provided by a representative of the Commission:

1.      Chase Paymentech, a division of JPMorgan Chase & Co., shall transfer to the Commission all assets, including reserve funds, held in the name of or for the benefit of any of the Defendants or Related Companies, including the Chase Paymentech accounts identified in Appendix 1 to this Order;

2.      Cynergy Data, LLC ("Cynergy"), now doing business as Priority Payment Systems LLC, shall transfer to the Commission all assets, including reserve funds, held in the name of or for the benefit of any of the Defendants or Related Companies, including the Cynergy accounts identified in Appendix 1 to this Order;

3.      Elavon Inc. ("Elavon") shall transfer to the Commission all assets, including reserve funds, held in the name of or for the benefit of any of the Defendants or Related Companies, including the Elavon accounts identified in Appendix 1 to this Order;

4.      Electronic Merchant Services ("EMS") shall transfer to the Commission all assets, including reserve funds, held in the name of or for the benefit of any of the Defendants or Related Companies, including the EMS accounts identified in Appendix 1 to this Order;

5.      First National Bank of Omaha ("First National") shall transfer to the Commission all assets, including reserve funds, held in the name of or for the benefit of any of the Defendants or Related Companies, including the First National accounts identified in Appendix 1 to this Order;

6.      Global Merchant Advisors shall transfer to the Commission all assets, including reserve funds, held in the name of or for the benefit of any of the Defendants or Related Companies, including the Global Merchant Advisors accounts identified in Appendix 1 to this Order;

7.      Ignite Payments, LLC ("Ignite Payments") shall transfer to the Commission all assets, including reserve funds, held in the name of or for the benefit of any of the Defendants or Related Companies, including the Ignite Payment accounts identified in Appendix 1 to this Order;

8.      Merchant e-Solutions shall transfer to the Commission all assets, including reserve funds, held in the name of or for the benefit of any of the Defendants or Related Companies, including the Merchant e-Solutions accounts identified in Appendix 1 to this Order;

9.      National Bank of California, now doing business as Commercial Bank of California, shall transfer to the Commission all assets, including reserve funds, held in the name of or for the benefit of any of the Defendants or Related Companies, including the National Bank of California accounts identified in Appendix 1 to this Order;

10.     National Merchants Association ("NMA") shall transfer to the Commission all assets, including reserve funds, held in the name of or for the benefit of any of the Defendants or Related Companies, including the NMA accounts identified in Appendix 1 to this Order;

11.     Powerpay, LLC ("Powerpay"), now doing business as EVO Payments International, shall transfer to the Commission all assets, including reserve funds, held in the name of or for the benefit of any of the Defendants or Related Companies, including the Powerpay accounts identified in Appendix 1 to this Order;

12.    Priority Payment Systems LLC ("Priority Payment") shall transfer to the Commission all assets, including reserve funds, held in the name of or for the benefit of any of the Defendants or Related Companies, including the Priority Payment accounts identified in Appendix 1 to this Order;

13.    Processing.com, LLC ("Processing.com") shall transfer to the Commission all assets, including reserve funds, held in the name of or for the benefit of any of the Defendants or Related Companies, including the Processing.com accounts identified in Appendix 1 to this Order;

14.    Select Bankcard shall transfer to the Commission all assets, including reserve funds, held in the name of or for the benefit of any of the Defendants or Related Companies, including the Select Bankcard accounts identified in Appendix 1 to this Order;

15.    Signature Processing Inc. ("Signature Processing") shall transfer to the Commission all assets, including reserve funds, held in the name of or for the benefit of any of the Defendants or Related Companies, including the Signature Processing accounts identified in Appendix 1 to this Order;

16.    Synovus Financial Corp. ("Synovus") shall transfer to the Commission all assets, including reserve funds, held in the name of or for the benefit of any of the Defendants or Related Companies, including the Synovus accounts identified in Appendix 1 to this Order;

17.    TransFirst shall transfer to the Commission all assets, including reserve funds, held in the name of or for the benefit of any of the Defendants or Related Companies, including the TransFirst accounts identified in Appendix 1 to this Order;

18.    U.S. Merchant Systems ("USMS") shall transfer to the Commission all assets, including reserve funds, held in the name of or for the

benefit of any of the Defendants or Related Companies, including the USMS accounts identified in Appendix 1 to this Order;

19.     Vantiv, Inc. ("Vantiv") shall transfer to the Commission all assets, including reserve funds, held in the name of or for the benefit of any of the Defendants or Related Companies, including the Vantiv accounts identified in Appendix 1 to this Order;

20.     Woodforest National Bank ("Woodforest") shall transfer to the Commission all assets, including reserve funds, held in the name of or for the benefit of any of the Defendants or Related Companies, including the Woodforest accounts identified in Appendix 1 to this Order; and

21.     Worldpay Group plc ("Worldpay") shall transfer to the Commission all assets, including reserve funds, held in the name of or for the benefit of any of the Defendants or Related Companies, including the Worldpay accounts identified in Appendix 1 to this Order.

D.     If the aggregate amount held in the reserve accounts of the entities listed in Subsection XIII.C above as of the date of entry of this Order ("the Aggregate Reserve Amount") is less than two million, three hundred eight thousand, eight hundred ninety dollars ($2,308,890), then Defendants are ordered to pay to the Commission the difference between such amount and two million, three hundred eight thousand, eight hundred ninety dollars ($2,308,890) within 30 days of entry of this Order by electronic fund transfer in accordance with instructions previously provided by a representative of the Commission.

E.     Defendants shall execute, or cause to be executed, within three (3) days of written notice of this Order, all documents necessary to effectuate the transfer of the Aggregate Reserve Amount, including providing any documents necessary to determine the Aggregate Reserve Amount.

F.     The Commission's agreement to the suspension of part of the judgment is expressly premised upon the truthfulness, accuracy, and completeness of Defendants' sworn financial statements and related documents (collectively, "financial representations") submitted to the Commission, namely:

1.     the Financial Statement of Individual Defendant Richard Fowler signed on June 29, 2017, including all documents attached or incorporated by reference therein;

2.     the Financial Statement of Individual Defendant Ryan Fowler signed on June 29, 2017, including all documents attached or incorporated by reference therein;

3.     the Financial Statement of Individual Defendant Nathan Martinez signed on June 29, 2017, including all documents attached or incorporated by reference therein;

4.     the Financial Statement of Corporate Defendant Ad Kings LLC signed by Sean Colwell, Chief Executive Officer, on June 27, 2017, including all documents attached or incorporated by reference therein;

5.     the Financial Statement of Corporate Defendant Apex Advertising LLC signed by Adrian Skibine, Chief Executive Officer, on June 27, 2017, including all documents attached or incorporated by reference therein;

6.     the Financial Statement of Corporate Defendant Brand Development Corp. signed by Rodney Fetaya, Chief Executive Officer, on June 27, 2017, including all documents attached or incorporated by reference therein;

7.     the Financial Statement of Corporate Defendant Coastal Ads LLC signed by Oscar Maria, Chief Executive Officer, on June 27, 2017, including all documents attached or incorporated by reference therein;

8.	the Financial Statement of Corporate Defendant Delux Advertising LLC signed by Jack Cooper, Chief Executive Officer, on June 27, 2017, including all documents attached or incorporated by reference therein;

9.	the Financial Statement of Corporate Defendant Diamond Ads LLC signed by Nathan Martinez, Chief Executive Officer, on June 27, 2017, including all documents attached or incorporated by reference therein;

10.	the Financial Statement of Corporate Defendant Digital Nutra LLC signed by Hadi Assposito, Owner and Officer, on June 27, 2017, including all documents attached or incorporated by reference therein;

11.	the Financial Statement of Corporate Defendant Exclusive Advertising LLC signed by Marco Fregoso, Chief Executive Officer, on June 27, 2017, including all documents attached or incorporated by reference therein;

12.	the Financial Statement of Corporate Defendant Iron Ads, LLC signed by Nathan Martinez, Chief Executive Officer, on June 27, 2017, including all documents attached or incorporated by reference therein;

13.	the Financial Statement of Corporate Defendant LeadKing Advertising LLC signed by Nathan Martinez, Chief Executive Officer, on June 27, 2017, including all documents attached or incorporated by reference therein;

14.	the Financial Statement of Corporate Defendant Lead Seeker, LLC signed by Ryan Fowler, Chief Executive Officer, on June 27, 2017, including all documents attached or incorporated by reference therein;

15.	the Financial Statement of Corporate Defendant Mints Marketing LLC signed by Zoe Abel, Chief Executive Officer, on June 27, 2017, including all documents attached or incorporated by reference therein;

16.	the Financial Statement of Corporate Defendant Onyx Ads, LLC signed by Kyle Lawrence, Chief Executive Officer, on June 29, 2017, including all documents attached or incorporated by reference therein;

33

17.     the Financial Statement of Corporate Defendant Rebem, LLC signed by Emma Baker, Owner, on July 12, 2017, including all documents attached or incorporated by reference therein;

18.     the Financial Statement of Corporate Defendant Supertiser LLC signed by Richard Fowler, Chief Executive Officer, on June 27, 2017, including all documents attached or incorporated by reference therein;

19.     the Financial Statement of Corporate Defendant TARR Inc. signed by Richard Fowler, Chief Executive Officer, on June 27, 2017, including all documents attached or incorporated by reference therein;

20.     the Financial Statement of Corporate Defendant Verticality Advertising, LLC signed by Richard Fowler, Chief Executive Officer, on June 27, 2017, including all documents attached or incorporated by reference therein;

21.     the Financial Statement of Corporate Defendant White Dog Marketing, LLC signed by Rinata Dominguez, Chief Executive Officer, on June 27, 2017, including all documents attached or incorporated by reference therein;

22.     the additional documentation submitted by letter dated April 3, 2017, from the law firm of Rutan & Tucker, LLP, explaining the interests of Individual Defendants Richard Fowler and Ryan Fowler in a family trust and family partnership;

23.     the additional documentation submitted by letter dated April 24, 2017, from the law firm of Venable LLP, explaining the ownership interests of the assets held in a Wells Fargo account;

24.     the additional documentation submitted by email dated July 17, 2017, from the law firm of Venable LLP, with accompanying attachments, confirming the amounts held on behalf of the Corporate Defendants in certain merchant reserve accounts; and

25.    the additional documentation submitted by email dated July 28, 2017, from the law firm of Venable LLP, confirming the amounts held on behalf of the Defendants and the Related Companies in certain bank, investment, and merchant reserve accounts.

G.    The suspension of the judgment will be lifted as to any Defendant if, upon motion by the Commission, the Court finds that Defendant failed to disclose any material asset, materially misstated the value of any asset, or made any other material misstatement or omission in the financial representations identified above.

H.    If the suspension of the judgment is lifted, the judgment becomes immediately due as to that Defendant in the amount specified in Subsection XIII.A. above (which the parties stipulate only for purposes of this Section represents the consumer injury alleged in the Complaint), less any payment previously made pursuant to this Section, plus interest computed from the date of entry of this Order.

## XIV.

## ADDITIONAL MONETARY PROVISIONS

**IT IS FURTHER ORDERED** that:

A.    Defendants relinquish dominion and all legal and equitable right, title, and interest in all assets transferred pursuant to this Order and may not seek the return of any assets.

B.    The facts alleged in the Complaint will be taken as true, without further proof, in any subsequent civil litigation by or on behalf of the Commission, including in a proceeding to enforce its rights to any payment or monetary judgment pursuant to this Order, such as a nondischargeability complaint in any bankruptcy case.

C.    The facts alleged in the Complaint establish all elements necessary to sustain an action by the Commission pursuant to Section 523(a)(2)(A) of the

Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), and this Order will have collateral estoppel effect for such purposes.

D. Defendants acknowledge that their Taxpayer Identification Numbers (Social Security Numbers or Employer Identification Numbers), which Defendants previously submitted to the Commission, may be used for collecting and reporting on any delinquent amount arising out of this Order, in accordance with 31 U.S.C. § 7701.

E. All money paid to the Commission pursuant to this Order may be deposited into a fund administered by the Commission or its designee to be used for equitable relief, including consumer redress and any attendant expenses for the administration of any redress fund. If a representative of the Commission decides that direct redress to consumers is wholly or partially impracticable or money remains after redress is completed, the Commission may apply any remaining money for such other equitable relief (including consumer information remedies) as it determines to be reasonably related to Defendants' practices alleged in the Complaint. Any money not used for such equitable relief is to be deposited to the U.S. Treasury as disgorgement. Defendants have no right to challenge any actions the Commission or its representatives may take pursuant to this Subsection.

## XV.

## CUSTOMER INFORMATION

**IT IS FURTHER ORDERED** that Defendants and Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are hereby permanently restrained and enjoined from directly or indirectly:

A. failing to provide sufficient customer information to enable the Commission to efficiently administer consumer redress. If a representative of the

36

Commission requests in writing any information related to redress, Defendants must provide it, in the form prescribed by the Commission, within 14 days;

B.     disclosing, using, or benefitting from customer information, including the name, address, telephone number, email address, social security number, other identifying information, or any data that enables access to a customer's account (including a credit card, bank account, or other financial account), that any Defendant obtained prior to entry of this Order in connection with the sale of any Covered Product or Add-On product, service, or program; and

C.     failing to destroy such customer information in all forms in their possession, custody, or control within 30 days after receipt of written direction to do so from a representative of the Commission.

*Provided, however*, that customer information need not be disposed of, and may be disclosed, to the extent requested by a government agency or required by law, regulation, or court order.

## XVI.

## COOPERATION

**IT IS FURTHER ORDERED** that Defendants must fully cooperate with representatives of the Commission in this case and in any investigation related to or associated with the transactions or occurrences that are the subject of the Complaint. Such Defendants must provide truthful and complete information, evidence, and testimony. Such Individual Defendants must appear and such Corporate Defendants must cause Defendants' officers, employees, representatives, or agents to appear for interviews, discovery, hearings, trials, and any other proceedings that a Commission representative may reasonably request upon 5 days written notice, or other reasonable notice, at such places and times as a Commission representative may designate, without the service of a subpoena.

# XVII.

## ORDER ACKNOWLEDGMENTS

**IT IS FURTHER ORDERED** that Defendants obtain acknowledgments of receipt of this Order:

A.     Each Defendant, within 7 days of entry of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B.     For 5 years after entry of this Order, each Individual Defendant for any business that such Defendant, individually or collectively with any other Defendant, is the majority owner or controls directly or indirectly, and each Corporate Defendant, must deliver a copy of this Order to:  (1) all principals, officers, directors, and LLC managers and members; (2) all employees, agents, and representatives who participate in conduct related to the subject matter of the Order; and (3) any business entity resulting from any change in structure as set forth in the Section titled Compliance Reporting.  Delivery must occur within 7 days of entry of this Order for current personnel.  For all others, delivery must occur before they assume their responsibilities.

C.     From each individual or entity to which a Defendant delivered a copy of this Order, that Defendant must obtain, within 30 days, a signed and dated acknowledgment of receipt of this Order.

# XVIII.

## COMPLIANCE REPORTING

**IT IS FURTHER ORDERED** that Defendants make timely submissions to the Commission:

A.     One year after entry of this Order, each Defendant must submit a compliance report, sworn under penalty of perjury:

38

1. Each Defendant must: (a) identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission may use to communicate with Defendant; (b) identify all of that Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses; (c) describe the activities of each business, including the products, services, and programs offered, the means of advertising, marketing, and sales, and the involvement of any other Defendant (which Individual Defendants must describe if they know or should know due to their own involvement); (d) describe in detail whether and how that Defendant is in compliance with each Section of this Order; and (e) provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

2. Additionally, each Individual Defendant must: (a) identify all telephone numbers and all physical, postal, email and Internet addresses, including all residences; (b) identify all business activities, including any business for which such Defendant performs services whether as an employee or otherwise and any entity in which such Defendant has any ownership interest; and (c) describe in detail such Defendant's involvement in each such business, including title, role, responsibilities, participation, authority, control, and any ownership.

B. For 15 years after entry of this Order, each Defendant must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following:

1. Each Defendant must report any change in: (a) any designated point of contact; or (b) the structure of any Corporate Defendant or any entity that Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including: creation,

merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

2. Additionally, each Individual Defendant must report any change in: (a) name, including aliases or fictitious name, or residence address, or (b) title or role in any business activity, including any business for which such Defendant performs services whether as an employee or otherwise and any entity in which such Defendant has an ownership interest, and identify the name, physical address, and any Internet address of the business or entity.

C. Each Defendant must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Defendant within 14 days of its filing.

D. Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on: _____" and supplying the date, signatory's full name, title (if applicable), and signature.

E. Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue, NW, Washington, DC 20580. The subject line must begin: *FTC v. Tarr Inc., et al*.

## XIX.

## RECORDKEEPING

**IT IS FURTHER ORDERED** that Defendants must create certain records for 15 years after entry of the Order, and retain each such record for 5 years.

Specifically, Corporate Defendants and each Individual Defendant for any business that such Defendant, individually or collectively with any other Defendant, is a majority owner or controls directly or indirectly, must create and retain the following records:

A. accounting records showing the revenues from all products, services, and programs sold;

B. personnel records showing, for each person providing services, whether as an employee or otherwise, that person's: name; addresses; telephone numbers; job title or position; dates of service; and (if applicable) the reason for termination;

C. records of all consumer complaints and refund requests, whether received directly or indirectly, such as through a third party, and any response;

D. all records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the Commission; and

E. a copy of each unique advertisement or other marketing material.

## XX.

## COMPLIANCE MONITORING

**IT IS FURTHER ORDERED** that, for the purpose of monitoring Defendants' compliance with this Order:

A. Within 14 days of receipt of a written request from a representative of the Commission, each Defendant must: submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce documents for inspection and copying. The Commission is also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69.

B.     For matters concerning this Order, the Commission is authorized to communicate directly with each Defendant.  Defendants must permit representatives of the Commission to interview any employee or other person affiliated with any Defendant who has agreed to such an interview.  The person interviewed may have counsel present.

C.     The Commission may use all other lawful means, including posing, through its representatives as consumers, suppliers, or other individuals or entities, to Defendants or any individual or entity affiliated with Defendants, without the necessity of identification or prior notice.  Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

D.     Upon written request from a representative of the Commission, any consumer reporting agency must furnish consumer reports concerning Individual Defendants, pursuant to Section 604(1) of the Fair Credit Reporting Act, 15 U.S.C. § 1681b(a)(1).

## XXI.

## RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order. The parties have consented to continuing jurisdiction over this case by a magistrate judge. (Docket no. 4.)  By a separate order, this case, including interpretation and enforcement of this Order, is being referred to Magistrate Judge Karen Crawford or another duly-authorized magistrate judge for all purposes.

**IT IS SO ORDERED.**

DATED: November 13, 2017         _____
                                 Hon. Larry A. Burns
                                 United States District Judge

42